

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

ENTERED

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

*Harlin DeWayne Hale*

**United States Bankruptcy Judge**

**Signed March 21, 2012**

---

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **CASH REWARDS, INC,** | § | **Case No. 09-33685 HDH-7** |
| | § | |
| Debtor. | § | |

—

| | | |
|---|---|---|
| **DIANE REED, Chapter 7 Trustee for** | § | |
| **Cash Rewards, Inc.,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **Adversary No. 10-3212** |
| | § | |
| **LEO GRIGGS; GREAT** | § | |
| **SOUTHWESTERN ACQUISITIONS,** | § | |
| **INC.; and LGPC ENTERPRISES, L.P.,** | § | |
| **dba PARK CITIES DODGE,** | § | |
| | § | |
| Defendants. | § | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

In this adversary proceeding, the Trustee seeks to recover over $500,000 in funds

which the Trustee alleges were fraudulently transferred by the debtor, Cash Rewards, Inc., to Defendants. A trial on this adversary proceeding was held from February 28 to March 1, 2012. The Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052:

## FINDINGS OF FACT

1. **Parties**

   A. Trustee

      I. Diane Reed is the Chapter 7 Trustee for debtor Cash Rewards, Inc. ("Cash Rewards"), and is the Plaintiff in this adversary proceeding.

   B. Defendants

      I. Defendant Leo Griggs ("Griggs") is, and was at all times relevant to this case, the sole owner, officer, and employee of Defendant Great Southwest Acquisitions, Inc. ("GSA"). Griggs described GSA as a "pass-through company," and referred to GSA's bank account as his own.

      ii. Griggs, individually and through his interest in GSA, owns, and at all times relevant to this case owned, a controlling interest in Defendant LGPC Enterprises, L.P. d/b/a Park Cities Dodge ("Park Cities"). LGPC Enterprises, L.P. was formerly known as LGPC Dodge, LP. GSA is, and was at all times relevant to this case, the sole general partner of Park Cities.

      iii. Griggs, along with his and GSA's business partners, purchased the Dodge automobile dealership they later operated as Park Cities in or around February 2005. Of the partners in Park Cities, only Griggs held an office at the

dealership, and Griggs controlled Park Cities' day-to-day operations and its finances. Griggs was considered to be Park Cities' "dealer," the individual designated to represent the brands sold at Park Cities to the public.

iv.    Park Cities ceased operations as such on or about September 9, 2009 when Griggs resigned the Park Cities franchise. Park Cities' lender, Chrysler Financial and/or its successors and assigns, subsequently sued Park Cities and alleged that Park Cities defaulted on one or more loan obligations.

v.    GSA and Park Cities Dodge are, and were at all times relevant to this case, alter egos of Griggs.

**2.**    **Cash Rewards, Inc**.

I.    Cash Rewards was, at all times relevant to this suit, a Texas corporation.

ii.    David Maloy incorporated Cash Rewards in 2003. Maloy was the president and sole shareholder of Cash Rewards from its founding until it filed its petition for relief under Chapter 7 of the Bankruptcy Code on June 10, 2010 (the "Petition Date"). Maloy was involved in and directed the operations of Cash Rewards from its founding in 2003 until the Petition Date.

iii.    While it was in operation, Maloy marketed Cash Rewards to certain retail merchants as a customer incentive program. Maloy represented to potential merchants that, after paying a one-time setup fee to enroll in the Cash Rewards program, they could purchase cash reward certificates ("Certificates") from Cash Rewards for a small percentage of the Certificates'

face value. Participating merchants could then offer the Certificates free-of-charge as a sales incentive to prospective customers

iv.   After a participating merchant awarded a Certificate to a Customer, the merchant was required to pay Cash Rewards a percentage of the face value of the Certificate, usually around 15%. The merchant's customer then had to register the Certificate with Cash Rewards and provide certain supporting documents within seven days of accepting the Certificate. Certificate holders who met Cash Rewards' initial registration requirements could attempt to redeem the Certificate during a seven-day period three years later. However, those customers faced procedural hurdles, including an onerous list of required supporting documents and Cash Rewards' strict enforcement of the seven-day redemption window.

v.   According to the Trustee, Cash Rewards represented to merchants that its business model centered on the concept of "breakage," or the tendency of Certificate holders to fail to redeem their Certificates. To induce wary Merchants to financially support the Cash Rewards (or "CRI") scheme, Maloy made at least the following materially false representations to prospective merchants and did so knowingly and with the intent to defraud:

(a)   After CRI took out a small percentage of the money paid by retailers to cover CRI's administrative costs, funds paid to CRI to purchase cash reward certificates would be held in an escrow account so that they would be protected and available for repayment at the time for

redemption three years later. Maloy and CRI would not have access to those funds.  Only CRI's escrow agent would have access to the funds.

(b)     Reward money owed to a certificate holder would be paid out of the pool of funds collected in the month that the customer made a purchase and received a cash reward certificate.  As a result, even if CRI went bankrupt, claim-fund money would always be available at the time of redemption because each month's funds would be kept in a separate monthly pool in the escrow account.  If there was not enough money in the pool to pay in full all the cash rewards owed in a particular month, customers would be paid proportionately based on the amount of their cash reward certificates.  If there was money left over in the pool after all certificates for a particular month were paid in full, the excess money would be given to charity.

(c)     At the end of a certificate holder's three-year waiting period, an independent third-party administrator (ITPA) would determine whether the particular certificate holder was entitled to a cash reward, i.e., whether the certificate holder properly registered the certificate within seven days after it was issued and satisfied the instructions on the certificate at the time of redemption.  Given the independent role of the ITPA, Maloy and CRI could not reject any certificate holder for failing to satisfy any of CRI's redemption requirements.

vi.    To bolster Cash Rewards' claims about its transparency and trustworthiness and to further induce prospective merchants to participate, Cash Rewards' marketing materials included copies of letters from the alleged "escrow agent" and ITPA.   The letter from the escrow agent, however, materially misrepresented to prospective merchants that the escrow agent had no financial interest in or relationship to Cash Rewards when, in fact, the escrow agent was Cash Rewards' attorney and received a monthly fee for his participation in Cash Rewards.

vii.   Furthermore, Maloy frequently directed the funds transfers made by the purported "escrow agent," who was supposed to be solely responsible for managing funds paid to Cash Rewards to pay certificate redemption claims. In addition, Maloy and others at Cash Rewards were able to make transfers of claims funds across multiple accounts at Cash Rewards because, contrary to Maloy's representations to those he induced to fund the Cash Rewards scheme, Maloy—and not only the "escrow" agent—had access to the accounts in which claims funds were held.  As a result, Maloy and others at Cash Rewards were able to transfer money from the claims fund accounts to other accounts at Cash Rewards, and to ultimately appropriate those funds for personal use.  While Maloy assured Merchants that Cash Rewards would take only 15-20% of the Merchants' claim funds for its operating expenses, and would safeguard the balance until the Certificates to which the merchant

payments related were eligible for redemption, in reality he plundered the claims fund accounts and used the funds therein for personal gain.

viii.   Additionally, and contrary to Maloy's representations to prospective Merchants, the money paid into the claim fund account by Merchants were not segregated (either by actual segregation of bank accounts or through accounting records) into monthly pools to pay certificate claims as they came due. Contrary to Maloy's representations to Merchants about the ITPA's independent review of certificate claims, Maloy and Cash Rewards were actively involved in reviewing and rejecting Certificate claims, sometimes overturning the ITPA's determination that a Certificate claim should be paid.

ix.   Over the course of Cash Rewards' operation, Maloy looted the company. At least $5,400,000 was deposited into Cash Rewards' "lock-box accounts" in the three years immediately preceding the Petition Date to fund Certificate redemptions; consequently at least $4,300,000 (or 80% of the $5,400,000 paid in) should have remained in the lock-box accounts on the Petition Date. However, on the Petition Date, Cash Rewards' lock-box accounts were essentially empty, creating an unfunded liability of at least $4,300,000.00.

x.   While under Maloy's control, Cash Rewards transferred well in excess of 20% of the funds in the lock-box accounts into accounts from which Maloy, his wife Charlyn Maloy ("Charlyn"), and their daughter Linsey Maloy ("Linsey"), misappropriated substantial portions of those funds for their own benefit. This misappropriation of Cash Rewards funds occurred primarily through 1)

transfers of several hundred thousand dollars of Cash Rewards funds to bank accounts under the control of one or more members of the Maloy family, 2) purchases of over $100,000 of clothing, household, and personal items with Cash Rewards funds, 3) a $25,000 monthly salary paid to Charlyn for paying Cash Rewards' bills "from home," and 4) transfers of Cash Rewards funds to third parties, including Defendants, for the benefit of one or more members of the Maloy family.

xi.    Ultimately Cash Rewards filed for bankruptcy and Maloy pled guilty to mail fraud in connection with the operation of Cash Rewards. In connection with his guilty plea, Maloy admitted that his representations "about the operations of [Cash Rewards] and the security of funds paid into [Cash Rewards] were false," as Maloy directly and indirectly moved Cash Rewards funds from the lock-box accounts to other accounts and denied the redemption claims of otherwise eligible Certificate holders.

xii.   Before Griggs resigned the Park Cities franchise, Park Cities was a participating merchant in Cash Rewards' scheme.

xiii.  Shortly on or before the Petition Date, Maloy or one or more persons acting on his behalf destroyed the corporate records of Cash Rewards in an attempt to cover up Maloy's fraud. In the months leading up to the Petition Date, Maloy transferred approximately $400,000 of Cash Rewards funds to personal bank accounts for personal use by Maloy and his family members. After the Petition Date, and in violation of an order of this Court, Maloy failed to

disclose the assets within his control to the Trustee and, acting with the intent to place assets beyond the reach of Cash Rewards' creditors, the Trustee, and the Court, conveyed assets stolen from Cash Rewards to one or more third parties.   Maloy also failed to comply with and intentionally frustrated the Trustee's attempts to carry out her duties with regard to Cash Rewards' bankruptcy estate.   As a result of Maloy's intentional disregard of this Court's order, he was held in contempt and incarcerated for a time in July 2010.

**3.    Transfer One**

I.   On February 8, 2005, $250,000 was transferred from a Cash Rewards account at Compass Bank styled "Claim Fund Escrow" ("Account No. 2828") into a second Cash Rewards account at Compass Bank ("Account No. 2852").

ii.   Also on February 8, 2005, Maloy drafted and gave to Griggs a check for $250,000 drawn on Account No. 2852 ("Check No. 9308"), which check bore the notation "Investment Loan Due by 3-4-05."   Later the same day, Griggs deposited Check No. 9308 into a GSA account at Compass Bank ("Account No. 9151").

iii.   Maloy and Griggs have given conflicting accounts of the purpose of Transfer One.   In his affidavit in support of Defendants' Motion for Summary Judgment, Griggs claimed that "[t]he purpose of these funds was to assist [him] in purchasing a new Dodge dealership, though the Dodge dealership purchase did not materialize."   During the first of two depositions he gave in this case, however, Griggs testified that he used the funds conveyed in Check

9308 "for the seed money for [his] new company … Park Cities Dodge." Griggs specifically testified that he deposited Check 9308 and transferred the funds into an account owned by Park Cities at Compass Bank to demonstrate to Chrysler Motors that he or the dealership had $2,800,000 in the bank.

iv.     Griggs also testified that he borrowed the Transfer One funds from Maloy because he was "short $250,000, exactly" in meeting this $2.8 million requirement.

v.     On March 7, 2005, Griggs drafted a check in the amount of $250,000 and made out to Cash Rewards ("Check No. 1164") on Account No. 9151, and delivered it to Maloy.

vi.     On March 9, 2005, Check No. 1164 was deposited into Cash Rewards' Account No. 2828. On March 17, 2005, Cash Rewards transferred $1,000,000 from Account No. 2828 to Account No. 2852. Also on March 17, 2005, $1,000,000 was withdrawn from Account No. 2852 via a cashier's check made payable to Cash Rewards. The same day, the $1,000,000 cashier's check from Compass Bank was used to purchase a $1,000,000 certificate of deposit in Cash Rewards' name at Bank of the West (the "$1,000,000 CD"). On March 30, 2005, Cash Rewards, acting through Maloy, pledged the $1,000,000 CD as collateral to secure a $250,000 loan from Bank of the West ("Loan No. 109983").

vii.     The $250,000 loaned as Loan No. 109983 was paid as a single advance on March 30, 2005. Also on March 30, 2005, Bank of the West issued a

$250,000 cashier's check to Maloy, which Maloy deposited into the Compass Bank account he shared with Charlyn ("Account No. 1514"). The same day, Maloy drafted a check in the amount of $250,000 and made out to Griggs ("Check No. 9156") on Account No. 1514. On March 31, 2005, Griggs deposited Check No. 9156 into Account No. 9151. On April 1, 2005, Check No. 9156 was debited from Account No. 1514. According to credible testimony from Cynthia Aranda of Bank of the West, the loan was repaid, over the course of several months, by Park Cities. Griggs' testimony on the repayment was inconsistent, but he appeared to verify the repayment. Defendants, therefore, repaid the $250,000 received as a result of Check No. 9156.

viii. Maloy's fraudulent attempt to hide Transfer One from view by moving the $250,000 that was eventually transferred to Defendants through several bank accounts and negotiable instruments at two different banks is typical of the manner in which he kept the Cash Rewards scheme afloat. For example, over April 18 and 19, 2005, Maloy moved $100,000 from a Cash Rewards account at Compass Bank, through a series of certificates of deposit and cashier's checks drawn on Compass Bank and Bank of the West accounts and payable to himself or Cash Rewards, into the Compass Bank checking account he shared with his wife. Maloy's actions regarding Transfer One are some evidence of his actual fraud in Transfer Two.

## 4.    Transfer Two

I.      Cash Rewards made a fraudulent transfer of approximately $250,000 in Cash Rewards' funds to Defendants in March 2008, the purpose of which was to place Cash Rewards' assets beyond its creditors' reach.  On February 7, 2008, Cash Rewards, acting through Maloy and Charlyn, purchased a $100,000 certificate of deposit (the "$100,000 CD") using funds from a Cash Rewards account at Bank of the West ("Account 3321").

ii.     On February 8, 2008, Maloy took out a personal loan from Bank of the West in the amount of $249,681.70 ("Maloy's Bank of the West Loan") and pledged the title to a Lamborghini ("Lamborghini 6026"), which he purchased with the proceeds of Maloy's Bank of the West Loan, as collateral.  Maloy also pledged the $100,000 CD as collateral for Maloy's Bank of the West Loan.

iii.    On or about March 13, 2008, Maloy traded Lamborghini 6026 in for a new Lamborghini ("Lamborghini 6576").  On March 17, 2008, Bank of the West accepted Maloy's substitution of Lamborghini 6576 for Lamborghini 6026 as collateral for Maloy's Bank of the West Loan and released its lien on Lamborghini 6026.

iv.     Griggs testified during his first deposition that Maloy approached him in March 2008 and asked for a loan of $250,986.59 because "he was exchanging – changing banks."  In exchange for the $250,986.59 loan, Griggs testified, Maloy said he would repay Griggs "in a week or two" and offered to allow Park Cities to hold the title to a Lamborghini until the loan was repaid.

v.       Griggs testified that he instructed Luis Perez, Park Cities' General Manager, to prepare a Park Cities check payable to Bank of the West for $250,986.59 after Perez verified that the Lamborghini title was in order. On March 26, 2008, a check in the amount of $250,986.59 ("Check No. 024932") was drafted on a Park Cities account at Compass Bank. Check No. 024932 listed Bank of the West as payee but contained no notation regarding the account at Bank of the West to which it would be applied and made no reference to Cash Rewards.

vi.      On March 26, 2008, Maloy negotiated Check No. 024932 to Bank of the West, with the funds from Check No. 024932 applied to pay off Maloy's Bank of the West Loan. The funds of Check No. 024932 were used to pay a personal obligation of Maloy's—to wit, the encumbrance on his personal vehicle—and Cash Rewards received no material value from Check No. 024932.

vii.     Also on March 26, 2008, Bank of the West released its lien on the $100,000 CD, and Cash Rewards deposited the $100,000 CD into Cash Rewards' Account No. 3321 at Bank of the West.

viii.    Park Cities' records reflect that Park Cities purchased Lamborghini 6576 for $250,986.59, the exact amount of Check 024932. The dealership's records further show that the purchase of Lamborghini 6576, referred to by its Park Cities stock number of DP5002, was recorded as a "used vehicle purchase" and that Lamborghini 6576 was logged into Park Cities' used car inventory

on March 26, 2008. Griggs' testimony to the contrary on the nature of the transaction is not consistent with the records of his own business or of Bank of the West, which reflected that the vehicle was purchased by Park Cities.

ix.    For reasons which neither Griggs nor Park Cities' former Controller, Kevin Frost, could explain, the dealership later "ma[de] an … internal adjustment as to exactly how [the purchase of Lamborghini 6576] was recorded." While a "deal file," or a paper record of the transaction involving Lamborghini 6576, should have been created, Park Cities failed to produce any such file. The file, if it existed, would have contained a copy of the title to Lamborghini 6576, cancelled checks related to the transaction, and an affidavit Maloy signed giving Park Cities the right to sell Lamborghini 6576.

x.    This bizarre transaction was, according to Griggs, one of a kind for Park Cities.

xi.    On March 31, 2008, Maloy, acting on behalf of Cash Rewards, drafted a check in the amount of $250,986.59 and payable to Park Cities ("Check No. 1045"), to be paid out of a Cash Rewards account at Bank of the West. Maloy gave Check No. 1045 to Defendants and, on March 31, 2008, Check No. 1045 was deposited into Park Cities' account at Compass Bank, accomplishing the transfer the Trustee has referred to as Transfer Two.

xii.    None of Defendants repaid the $250,986.59 received as a result of Check No. 1045. The $250,986.59 conveyed to Defendants in Check No. 1045 was the property of Cash Rewards. Cash Rewards did not receive reasonably

equivalent value in exchange for the transfer of funds accomplished by Check No. 1045.

xiii.   At the time of Transfer Two, one or more creditors of Cash Rewards had one or more claims against Cash Rewards and would have been entitled to avoid Transfer Two under applicable state law.  As such, the Trustee has standing to pursue her claim under Tex. Bus. & Com. Code § 24.005(a)(1) through 11 U.S.C. § 544(b) against Defendants relating to Transfer One.  The Trustee further has standing to pursue her claims under 11 U.S.C. § 544(a).  At the time of Transfer Two, Cash Rewards was insolvent, engaged in or was about to engage in business or a transaction for which any remaining property was unreasonably small, and intended to incur or believed it would incur debts beyond its ability to pay them as they came due.

**5.    Insolvency**

I.     Cash Rewards was insolvent before, during, and after Transfer Two.  As of the end of 2007, Cash Rewards reported an annual loss of $126,540, $1,133,790 in assets supposedly held in escrow for the Certificate claims fund, and $1,257,111 in liabilities for Certificate redemptions payable.  Thus, very shortly before Transfer Two was executed, Cash Rewards lacked sufficient assets to cover at least $123,321 in Certificate redemption claims.  By the end of 2008, as the fraudulent scheme neared its demise and after Transfer Two deprived Cash Rewards of $250,986.59 of funds, the situation had worsened. Cash Rewards reported an annual loss of $141,260 for 2008, and reported no

funds escrowed for payment of $95,107 in Certificate redemptions payable. There is no evidence that Cash Rewards' financial situation materially improved before or after Transfer Two which would contradict the clear picture of worsening insolvency painted by Cash Rewards' tax returns. Indeed, since Cash Rewards filed for bankruptcy in June 2009, nearly 600 claims totaling at least $5,849,271.46 have been filed against the bankruptcy estate.

ii.    At the time of Transfer Two, Cash Rewards was also presumed to be insolvent.  Maloy's testimony in the Statement of Facts (Pl.'s Ex. 6) offered in his criminal proceeding lead to the conclusion that during the time Transfer Two occurred, Cash Rewards was not generally paying its debts as they became due.  While Maloy has lied to this Court before, at this stage, his testimony appears credible for finding a presumption of insolvency exists.

**6.    Griggs and Maloy**

I.    Maloy and Griggs are close, childhood friends and Griggs has testified that he has known Maloy "as well as any good friend could."  Over the course of their decades-long friendship, Griggs has loaned money to Maloy several times and has obtained loans on Maloy's behalf.

ii.    Cash Rewards was not in the business of making loans or investments in car dealerships.  There was no business justification for the transfers from Cash Rewards to either Griggs or Park Cities Dodge.  The transfers from Cash Rewards to Griggs and Park Cities Dodge were totally inconsistent with the

business operations of Cash Rewards, which was to administer a customer rewards program to assist merchants in the marketing of their product.  The transfers of assets of Cash Rewards were solely for Griggs' benefit and were to the detriment of Cash Rewards.

    iii.    After the Petition Date and after this Court ordered Maloy not to convey away his assets, Griggs gave or loaned Maloy at least $235,000 in cash.  Maloy used said funds to pay approximately $20,000 in legal fees associated with claims the Trustee brought against Maloy and his family, and used the balance to purchase luxury automobiles for himself and family members and several recreational vehicles, all in violation of this Court's injunction regarding the use of Maloy's assets.

## 7.    Attorney's Fees

    I.    The Trustee has incurred reasonable and necessary attorneys' fees and costs of court in this matter.  Costs and reasonable attorneys' fees are allowed under Section 24.013 of the Texas Business and Commerce Code in an amount to be determined after trial.

## CONCLUSIONS OF LAW

**1.    Jurisdiction and Venue**

    I.    The Trustee's Complaint and First Amended Complaint were filed pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure; 11 U.S.C. §§ 544, 548, and 550; Tex. Bus. & Com. Code §§ 24.005, 24.006 and 24.008; and Texas common law and commenced an adversary proceeding in the above captioned bankruptcy case.

    ii.    Venue is proper pursuant to 28 U.S.C. § 1409.

    iii.    This Court has jurisdiction over the subject matter of this adversary proceeding pursuant to 28 U.S.C. § 1334.  This is a core proceeding.  28 U.S.C. § 157(b)(2)(H).

**2.    Defendants**

    I.    Griggs was an insider of Cash Rewards.  11 U.S.C. § 101(31)(B); *In re Premiere Network Services, Inc.*, 333 B.R. 126, 128 (Bankr. N.D. Tex. 2005).

    ii.    Griggs is an alter ego of Park Cities Dodge.  *Sommers v. Sorce (In re Major Funding Corp.)*, 126 B.R. 504 (Bankr. S.D.Tex. 1990) ("The court follows a two step test in determining alter ego.  The first step is to determine if there is such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist . . . The second step is to determine if failure to disregard the corporate form would result in fraud or injustice . . .) (internal citations omitted).

       iii.      Griggs is an alter ego of GSA.  *Id.*

**3.**      **Transfer One**

       I.      Although many of the elements of an actual fraudulent transfer were met in this case, the credible evidence of Cynthia Aranda of Bank of the West shows that Transfer One was repaid in a series of payments by Park Cities.  Griggs' somewhat inconsistent testimony supports this conclusion.  Accordingly, as the estate was placed back to where it should have been, Cash Rewards suffered no damage, and the Trustee may not recover for Transfer One.

**4.**      **Transfer Two**

       I.      Section 548 of the Bankruptcy Code allows the Trustee to avoid transfers of debtor property made within one year prior to filing bankruptcy, if, inter alia, the debtor made the transfers with actual intent to hinder, delay, or defraud creditors.  See 11 U.S.C. § 548.  The Trustee may also avoid any transfer of an interest of the debtor in property that is avoidable under applicable state law by a creditor holding an allowed unsecured claim. See 11 U.S.C. § 544(b).

       ii.      Since direct proof of fraud often is not available, courts may rely on circumstantial evidence to establish fraudulent intent.  *Roland v. United States*, 838 F.2d 1400 (5th Cir. 1998); Williams & Chastain v. Laird, 32 S.W.2d 502, 505 (Tex. Civ. App. 1930).  When several indicia of fraud are found, they may form the foundation for an inference of fraud.  *Id*. 838 F.2d

at 1403. This foundation is built upon what are known as "badges of fraud."

*Texas Sand Co. v. Shield*, 381 S.W.2d 48, 53 (Tex. 1964). Section 24.005(b)

of the Texas Business & Commerce Code provides:

> In determining actual intent, consideration may be given, among other factors, to whether:
> (1) the transfer or obligation was to an insider;
> (2) the debtor retained possession or control of the property transferred after the transfer;
> (3) the transfer or obligation was concealed;
> (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
> (5) the transfer was of substantially all the debtor's assets;
> (6) the debtor absconded;
> (7) the debtor removed or concealed assets;
> (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
> (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
> (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
> (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

iii.   Like TUFTA, the Bankruptcy Code also unwinds transfers made "with actual

intent to hinder, delay or defraud" creditors, 11 U.S.C. § 548(a)(1). Courts

have also identified various "badges of fraud" that tend to evidence a transfer

made with intent to defraud under § 548 and § 727:

> (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of events and transactions under inquiry.

*In re Soza,* 542 F.3d 1060, 1067 (5th Cir. 1998).

iv. The following badges of fraud are implicated by Transfer Two: 1) the lack of consideration Cash Rewards received for Transfer Two; 2) the friendship and close associate relationship between Griggs and Maloy; 3) Cash Rewards' insolvency before, during, and after Transfer Two; 4) the similarity of Transfer Two to Transfer One, and to other transfers Cash Rewards made before the Petition Date; 5) the short period of time over which Transfer Two was executed; and 6) the bizarre nature of the transaction.

v. Accordingly, Cash Rewards executed Transfer Two with the actual intent to hinder, delay, or defraud one or more present or future creditors of Cash Rewards.

vi. In addition, Cash Rewards did not receive reasonably equivalent value in exchange for Transfer Two. *In re TransTexas Gas Corp.*, 597 F.3d 298, 306 (5th Cir. 2010) (citing *In re Hinsley*, 201 F.3d 638, 644 (5th Cir. 2000)) (In measuring "reasonably equivalent value, we judge the consideration given for a transfer from the standpoint of creditors," as "[t]he proper focus is on the net effect of the transfers on the debtor's estate, and funds available to the unsecured creditors."). Essentially, the assets of Cash Rewards were used to pay the debt of Maloy. This is a classic constructive fraudulent transfer under Texas law.

vii. Cash Rewards was insolvent at the time of Transfer Two because the sum of Cash Rewards' debts was greater than all of its assets at a fair valuation and

Cash Rewards was not generally paying its debts as they came due. TEX. BUS. & COM. CODE § 24.003(a)-(b).

viii. As of the date of Transfer Two, Cash Rewards was engaged in or about to engage in a business or transaction for which the remaining assets of Cash Rewards were unreasonably small. TEX. BUS. & COM. CODE § 24.005(a)(2).

ix. At the time of the transfer, Cash Rewards was not generally paying its debts as they became due, and, therefore, it is presumed to be insolvent. That presumption was not refuted by the Defendants at trial. Also, as of the date of Transfer Two, Cash Rewards intended to incur, or believed or reasonably should have believed that Cash Rewards would incur, debts beyond its ability to pay as they became due. *Id.*

x. Transfer Two is avoidable pursuant to 11 U.S.C. § 548.

xi. Transfer Two is avoidable pursuant to TEX. BUS. & COM. CODE § 24.005(a)(1).

xii. Transfer Two is avoidable pursuant to TEX. BUS. & COM. CODE § 24.005(a)(2).

xiii. In the course of Transfer Two, $250,986.59 was fraudulently transferred to Defendants. The $250,986.59 conveyed in Transfer Two was the property of Cash Rewards.

xiv. Pursuant to 11 U.S.C. § 550, the Trustee is entitled to recover $250,986.59, as the value of the property which was fraudulently transferred to Defendants via Transfer Two.

xv. Pursuant to 11 U.S.C. § 544(b)(1), the Trustee is entitled to recover $250,986.59, as the value of the property which was fraudulently transferred to Defendants via Transfer Two.

**5. Attorney Fees**

I. The Trustee has incurred reasonable and necessary attorneys' fees and costs of court in this matter, which are allowable under Section 24.013 of the Texas Business & Commerce Code, in an amount to be determined after trial. Within fourteen days of entry of these findings and conclusions, counsel for the Trustee shall submit an affidavit for a statement of attorney fees and costs incurred and a proposed judgment. Counsel for Debtor shall have fourteen days to respond to such affidavit.

**###END OF FINDINGS & CONCLUSIONS###**